IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

SHEILA MORY                                                    PLAINTIFF

vs.                          CASE NO.   4:05-CV-01669 GTE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY                                DEFENDANT

## OPINION

Pursuant to 42 U.S.C. § 405(g), Plaintiff Sheila Mory appeals the decision of the Commissioner of the Social Security Administration to deny her claim for Disability Insurance benefits. Both parties have moved for judgment on the administrative record and submitted supporting briefs. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the ALJ's final decision that the Plaintiff is not disabled.

For the reasons discussed below, the Court concludes that it must remand the final decision of the Commissioner because it is not supported by substantial evidence.

## I. PROCEDURAL HISTORY

Plaintiff filed concurrent claims. On August 7, 2002, Plaintiff filed for Disability Insurance Benefits. To recover on her DIB claim, Plaintiff has to show that she was disabled on or before September 30, 2001. On August 18, 2002, Plaintiff filed for Supplemental Security Income payments. Therein, Plaintiff contends that she had been disabled since April 4, 2002.

Ms. Mory had two hearings before the ALJ. The first hearing was held on December 16,

2003; the transcript of that hearing is found in the record at pp. 41-59.  The second hearing was held on September 29, 2004; the transcript of that hearing is found in the record at pp. 60-95.

Plaintiff has also had two unfavorable ALJ decisions.  The first ALJ decision was issued on January 30, 2004, and rejected Plaintiff's claim.  [R. 96-102].  Plaintiff successfully appealed the decision to the Appeals Council, which remanded the case to the ALJ for further consideration by order dated June 8, 2004.  A second hearing was held on September 29, 2004.  On December 4, 2004, a second ALJ decision was issued and it again declined to award disability benefits.  [R. 15-27].   The second ALJ decision concluded that Plaintiff Mory could not be found to be disabled in the absence of substance abuse and if she complied fully with all prescribed treatment.  Plaintiff appealed this second denial to the Appeals Council.  The Appeals Council declined Plaintiff's request for review on October 6, 2005.  [R. 6].

## II. FACTUAL BACKGROUND

Plaintiff was born on October 17, 1955.  She was 48 years old at the time of the second hearing.  [R. 68].  Plaintiff earned a G.E.D. in 2000.  Her prior work consists of cleaning houses.  From 1986-1993, Plaintiff owned and managed a housecleaning service.  [R. 257].  In 2001 and the first part of 2002, Plaintiff attempted to complete cosmetology school, attending two different schools, but she was unable to complete the program.  Plaintiff testified that she was "halfway through" the cosmetology program.  [R. 69].   Plaintiff dropped out following an altercation with another student in the program.  [R. 83].

Plaintiff has a history of obsessive-compulsive disorder, opiate dependence on methadone management, dysthymic disorder, a major depressive disorder and an anxiety disorder.  She has also been diagnosed or treated for bipolar disorder (type II) and fibromyalgia.  [R. 125, 143, 149,

161, 301, 308, 310, and 331].

Plaintiff also has a long history of treatment for drug abuse. She has been in inpatient treatment programs at Charter Hospital (1992), Freedom House (1993) and Recovery Center of Arkansas (date unspecified). [R. 49]. During her hearing, Plaintiff acknowledged past abuse of opiates, such as hydrocodone, oxycodone, and tusmax. [R. 50].

On September 17, 2001, Plaintiff was admitted into the University of Arkansas Substance Abuse Treatment Clinic for opiate dependency. At that time, she was admitted into the Methadone Maintenance Program ("MMP") and given methadone medication on a daily basis.[1] At the time of the hearing before the ALJ, Plaintiff was apparently still participating in the MMP.

From reading Plaintiff's testimony in the two hearings (held before two different ALJ's), it is obvious that Plaintiff was impaired during the second hearing held on September 29, 2004. Plaintiff admitted taking benzodiazepines on the morning of the hearing. [R. 76]. Upon learning this the ALJ offered to postpone the hearing, but the Plaintiff's attorney indicated that Plaintiff wanted to complete the hearing. During the hearing, Plaintiff volunteers incriminating information and talks in a rambling, circular fashion at times. While it appears that Plaintiff, more or less, is able to understand and respond to the ALJ's questions, her impairment is obvious from the transcript, particularly when one compares the transcript to the first hearing held on December 16, 2003.

---

[1] Methadone is a long-acting synthetic narcotic analgesic used to treat opiate addiction. Methadone is also known as an "opiate agonist." Administered in the proper dose, methadone wards off withdrawal symptoms and reduces chronic narcotic craving, thereby permitting "normal" functioning. When used in maintenance treatment, methadone does not create euphoria, sedation, or analgesia, has no adverse effects on motor skills, mental capacity, or employability. www.drugpolicy.org/library/research/methadone.cfm

## III. STANDARD OF REVIEW

In this action for judicial review pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), the Court must determine whether there is substantial evidence on the record as a whole to support the decision of the Commissioner. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). This Court's review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Prosch,* 201 F.3d at *1012*. In determining whether substantial evidence exists, the court will consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel,* 212 F.3d 433, 435-36 (8th Cir. 2000). However, the Commissioner's findings may not be reversed merely because evidence may exist to support the opposite conclusion. *Mitchell v.* Shalala, 25 F.3d 712, 714 (8th Cir. 1994). As long as substantial evidence in the record supports the Commissioner's decision, the decision may not be reversed either because substantial evidence exists in the record that would have supported a contrary outcome, *id.,* or because this Court would have decided the case differently. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

## IV. DISCUSSION

The ALJ concluded that Mory was disabled "when all medically determinable impairments, including substance abuse with opiate dependency, are considered," but nondisabled if she stopped using drugs and complied with recommended prescribed treatment. [R. 21, 25]. In other words, the ALJ accepted the conclusions of Plaintiff's treating psychiatrists

4

that Plaintiff was "disabled," but he concluded that Plaintiff's substance abuse was a "material factor" in the disability. This is the appropriate analysis required by the regulations. See 20 C.F.R. § 404.1535(a)("If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."). In determining whether Plaintiff's substance abuse was a contributing factor material to the determination of disability, the regulations directed the ALJ to:

> evaluate which of [claimant's] current physical and mental limitations, upon which we based our current disability determination, would remain if [claimant] stopped using . . . drugs or alcohol and then determine whether any or all of [claimant's] remaining limitations would be disabling.

20 C.F.R. § 404.1535(b)(2). *See also Brueggaman v. Barnhart*, 348 F.3d 689, 694-95 (8th Cir. 2003).

A critical issue in this case is whether the ALJ erred in determining that Plaintiff's chronic substance abuse was a contributing factor material to her disability. The Court must review the record to determine whether substantial evidence exists for the ALJ's decision.

It is unnecessary to consider further whether Plaintiff should be considered disabled due to pain or fibromyalgia. First, the medical records are insufficient to support a disabling diagnosis due to anything other than Plaintiff's mental impairments. Additionally, during the September 2004 hearing, when asked what kept her from working, Plaintiff testified that her depression, fear and lack of concentration kept her from working. [R. 81-82]. Plaintiff did not mention any pain or fibromyalgia despite her generalized reports of "pain" in her application for benefits.

A.  **THE RECORD DOES NOT SUPPORT CRITICAL CONCLUSIONS THAT THE ALJ MADE REGARDING THE EXTENT OF PLAINTIFF'S DRUG USE.**

It appears the ALJ's conclusions were driven in large part by admissions of substance abuse made by Plaintiff during the September 29, 2004 hearing. While the ALJ overstated some of Plaintiff's admissions during the hearing and extrapolated the evidence beyond what the record justified, the Court recognizes that the record supports the conclusion that Plaintiff has a long-term substance abuse problem and that she had begun using drugs at some point prior to the September 2004 hearing. However, the record does not support the ALJ's assumption that Plaintiff used drugs continuously during the entire period of her alleged disability and hid such from her treating physicians. Instead, the record indicates that Plaintiff was sober for much of the period during which she participated in the methadone program, but that she had a significant relapse in the months prior to the September 2004 hearing. Nor is there substantial record evidence to support the ALJ's conclusion that the Plaintiff hid her ongoing drug use from her treating psychiatrists and therefore that their assessments of her mental impairments included limitations caused by her chronic substance abuse, a finding the ALJ used to justify disregarding the opinions of Plaintiff's treating psychiatrists.

The ALJ wrote in his opinion that "Ms. Mory cleans houses to give her easy access to prescription drugs," that she "testified that the reasons she cleans houses is easy access to other people's drugs," and that Ms. Mory pursued house-cleaning work "in order to access drugs for abuse." (R. 20, 21). The ALJ's conclusions overstate Plaintiff's testimony and are not supported by the record. Cleaning houses is the only occupation that Plaintiff has ever known. There is no evidence that Plaintiff selected this occupation for access to drugs. In fact, Plaintiff indicated in

6

her testimony that she was going to have to stop cleaning houses that had drugs in them. On the other hand, there is testimony in the record that indicates that Plaintiff at times took drugs from those houses she cleaned which had drugs available. Such testimony, however, is not inconsistent with Plaintiff's claims that she was sober for a substantial period of time, during which her ability to work remained impaired.

Plaintiff testified during the second hearing that she cleaned a house for Dr. Stolis (Aukstuolis),[2] a physician, and that he had prescribed Valium and Restoril for her. [R. 72-73]. While Ms. Mory testified that Dr. Stolis (Aukstuolis) wrote her a prescription for drugs after she informed him she could not sleep, there is no testimony or other evidence to support a finding that Ms. Mory stole drugs from Dr. Stolis when she cleaned his house. To be clear, while the ALJ's opinion, in context, might be read to suggest that Ms. Mory stole drugs from Dr. Stolis (Aukstuolis), there is no evidence that this is true. Rather, Dr. Stolis (Aukstuolis) wrote prescriptions for Plaintiff at her request. Plaintiff volunteered during the second hearing that she had misled Dr. Stolis (Aukstuolis) into writing her multiple prescriptions by telling him that the pharmacy was closed.

Dr. Sotlis (Aukstuolis) was not Plaintiff's only source for benzodiazepines. Plaintiff reported that she cleaned another house with "a pharmacy in it" and "they never [took] their drugs." She then testified that "she could not go back to that house." [R. 74]. Thus, while the testimony indicates that Plaintiff had a problem avoiding the temptation to take drugs present in the houses she cleaned, it does not indicate that she targeted houses to clean in order to access

---

[2] The transcript refers to Dr. Stolis' but a subsequent letter from Plaintiff's counsel indicates that Dr. Aukstuolis was the physician to whom Plaintiff was referring. [R. 120].

drugs to steal. Her testimony could just as easily be read to indicate that she avoided houses that she knew had drugs in them.

The ALJ brushed aside Plaintiff's testimony that she had abstained from drugs for three years, stating that such testimony was "obviously wrong." (R. 21). However, Plaintiff's testimony on this point is not without any basis in the record. It appears that the ALJ accepted as true all of Plaintiff's self-incriminating and volunteered statements during the September 2004 hearing, statements given when she was impaired, but summarily discounted any favorable testimony. Such an approach further undermines the ALJ's conclusions.

For example, the ALJ does not explain why Plaintiff's testimony that the longest she had been free of substance abuse (compliant) was the last three years was "obviously wrong." [R. 21]. In reviewing the testimony and other record evidence, it appears to this Court equally probable – and perhaps more likely – that Plaintiff was free of substance abuse and compliant until the few months prior to her September 2004 hearing. From the record, such period likely began in late June of 2004. On July 14, 2004, Plaintiff reported to her psychologist that she had been abusing sleeping pills. (R. 166). Plaintiff was seen by Dr. Belue on May 19, 2004, and June 16, 2004. Dr. Belue reported "no substance abuse other than being on methadone." (R. 153). Finally, on June 16, 2005, a letter from Dr. Crouch, a psychiatrist, reports remission from benzodiazepines beginning in January 2005. (R. 377). Thus, the medical records tend to support the limited conclusion that Plaintiff was abusing benzodiazepines during a period between late June/early July 2004 and January 2005.

Plaintiff testified that the longest time she had avoided substance abuse was during the period she had been in the methadone maintenance program ("MMP"). During her testimony,

8

Plaintiff at times appears to believe she had been in the MMP program for three years and at other times for four. In fact, at the time of the hearing, Plaintiff had been in the methadone program approximately 3 years.[3] Plaintiff testified that she didn't take any drugs "until recently" and that her drug use was exacerbated by the discovery that when she took benzodiazepines she could "feel the methadone." Plaintiff later testified that she had just started taking benzodiazepines about a month earlier. Plaintiff also testified that Dr. Stolis (Aukstuolis) gave her six months worth of benzodiazepines from his own drug supply. [R. 75]. The ALJ did not pinpoint when the doctor gave her these drugs.

Plaintiff's assertion that she had been clean during most of the time she participated in the MMP program appears consistent with the record as a whole. While Plaintiff may have recalled incorrectly the amount of time she had been in the program, or failed to accurately pinpoint the exact time frame she had began taking drugs prior to the hearing, such inaccuracy could well have been due to honest mistake (or impairment) rather than intentional untruth. Instead, the ALJ appeared to assume that Plaintiff had been using drugs continuously the entire time.

The ALJ made no effort to deal with the effect of Plaintiff's uninterrupted participation in the methadone program. The record indicates that Plaintiff was compliant with the MMP. (R. 119, 150). The methadone records suggest that Plaintiff may have been tested for drug use as part of the program. It seems unlikely that Plaintiff would have remained eligible to continue to receive methadone while she was abusing other drugs. This case is unusual in that an actual record of Plaintiff's drug use may actually be available from the MMP, but it does not appear that

---

[3] Plaintiff enrolled in the Methadone Maintenance Program at UAMS on September 17, 2001 for opiate history. [R. 270]. Thus, at the time of the second hearing on September 29, 2004, Plaintiff had been in the program for 3 years, not 4 years.

9

such records were sought or factored into the ALJ's conclusions.

In sum, the present record simply does not support the ALJ's assumption that Plaintiff had been using drugs continuously during the alleged onset of her disability through the September 2004 hearing date.

The ALJ's assumption that Ms. Mory hid her ongoing substance abuse from her treating physicians is likewise not supported by the record. For example, the records of Ms. Mory's visits with Dr. Lynch and Dr. Belue reveal that the physicians were well aware of Ms. Mory's substance abuse history and were constantly assessing her for ongoing drug use. Dr. Belue repeatedly noted that Plaintiff denied use of any substance other than methadone. Dr. Lynch's office visit records indicate that Dr. Lynch was keenly aware of claimant's substance abuse. Further, Plaintiff reported sporadic drug use to Dr. Lynch. Several entries note that Ms. Mory had admitted substance relapse. For example, on June 15, 2001, Dr. Lynch noted that Ms. Mory had participated in drug seeking and had taken Xanax. And, on September 20, 2001, Dr. Lynch noted that Plaintiff had indicated substance abuse. Thus, contrary to the ALJ's sweeping assertions to the contrary, the record reveals that Ms. Mory did report substance use to her treating physicians on various occasions.

Further, from Ms. Mory's performance at the September 2004 hearing, it does not appear that she is able to hide her use of prescription drugs when she is under their influence. Thus, if Ms. Mory had gone to her doctor visits impaired, her psychiatrists would readily have observed such intoxication and noted such. Thus, the ALJ's broad generalization that Drs. Lynch and Belue's documentation of substantial mental impairments and disorders necessarily included Ms. Mory's impairments while using drugs is not supported by the record.

It strikes that Court that there may be a pattern which indicates that Plaintiff does not seek professional medical treatment when she is abusing drugs. For example, there is a gap in the Plaintiff's medical records between July of 2004 and January 21, 2005. There are no medical records indicating that Plaintiff obtained treatment from Dr. Belue or any other psychiatrist during this five-month period. Significantly, this would be a period that included Plaintiff's acknowledged illicit use of benzodiazepine. The ALJ noted this gap in treatment and factored it into his assessment that Plaintiff's testimony regarding disability limitations or status were seriously undermined. But, again, this gap disregards the consistent periods prior to July 2004, during which Plaintiff was obtaining ongoing medical care and Plaintiff's psychiatrist were reporting no substance abuse.

   B.   **THE ALJ IMPROPERLY SUBSTITUTED HIS OPINION FOR THAT OF PLAINTIFF'S TREATING PHYSICIANS**

The Claimant contends that the ALJ erred in rejecting the conclusion of Ms. Mory's treating physicians. The Court agrees. The finding is intertwined with the determination of whether the ALJ erred in determining that Plaintiff's chronic substance abuse was a contributing factor material to her disability.

On November 11, 2003, Dr. Paula Lynch completed a Mental Residual Functional Capacity (Mental) Evaluation on Ms. Mory.[4] Therein, Dr. Lynch assessed Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting. Regarding the ability

---

[4] Dr. Lynch saw Plaintiff longer than any other psychiatrist. The medical records before the Court indicate that Plaintiff saw Dr. Lynch on July 24, 2002, June 26, 2002; June 3, 2002; May 22, 2002; April 15, 2002, February 21 2002, January 2, 2002, December 4, 2001, November 7, 2001, October 11, 2001, September 20, 2001, July 26, 2001, July 6, 2001, June 22, 1001, June 5, 2001, May 25, 2001, April 18, 2001, March 20, 2001, and January 30, 2001.

to make occupational adjustments, Dr. Lynch wrote that Ms. Mory "has cognitive and mood impairments to the degree that occupational adjustments are unpredictable." Dr. Lynch rated as "poor/none" (the lowest available rating) Ms. Mory's ability to do the following:

– "understand, remember and carry out complex job instructions"

– "understand, remember and carry out detailed, but not complex job instructions"

– "behave in an emotionally stable manner"

– "relate predictably in social situations"

– "demonstrate reliability"

(R. 140-41).

Dr. Lynch made the following comments: "Memory for retention and recall is impaired rendering task performance difficult"; "Due to disabling anxiety, personal and social adjustments are severely impaired"; "Agoraphobia & severe depression impedes getting out of residence and completing simple tasks of daily living." (R. 141). Dr. Lynch did not mention that any of the claimant's limitations were secondary to drug or alcohol abuse.

Ms. Mory's most recent psychiatrist is Dr. Kara Belue, who treated Ms. Mory several times in 2004. (R. 145-66). On June 16, 2004, Dr. Belue reported Ms. Mory's diagnoses as a mood disorder, rule out bipolar disorder, rule out major depression, history of dysthymic disorder, an obsessive-compulsive disorder and opioid dependence on methadone maintenance. Dr. Belue assessed Ms. Mory GAF as 45.[5] (R. 151). On August 19, 2004, Dr. Belue reported that although she did not do occupational assessments, she felt the claimant's behavior and observed symptoms would make it difficult for Ms. Mory to maintain full-time employment. (R.

---

[5] See footnote 6, infra, for a discussion of GAF ratings.

201).

Dr. Lynch's assessments of Ms. Mory differ considerably from those of Dr. Dan Donahue, a clinical psychologist, designated by the Commissioner. Dr. Donahue concluded: "The claimant is able to perform work where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote; few variables; little judgment; supervision required is simple, direct and concrete." (R. 349).

The ALJ summarily discounts the reports of Drs. Lynch and Belue, apparently based on his sweeping contention that Ms. Mory was deceiving them all along about her pattern of serious, ongoing substance abuse and thus, that their reports of limitations reflected limitations due to substance abuse rather than Ms. Mory's capacity in the absence of substance abuse. The ALJ's conclusions regarding Ms. Mory's drug use appear overstated and ignore other evidence in the record. To reach his conclusion, the ALJ would have had to find that Plaintiff lied to her treating psychiatrists continuously about her drug use. As already noted, the record does not so indicate.

The Court agrees with the claimant that the ALJ failed to address the medical assessments of Ms. Mory's treating physicians as required by the Social Security Regulations. See 20 C.F.R. § 404.1527(c). The regulations specifically require the ALJ to assess the record as a whole to determine whether the treating physician's opinions are inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). Generally, a treating source's medical opinion is afforded greater weight, or controlling weight, as long as the medical opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th

Cir. 2001); *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996)(treating physician's opinion does not automatically control, since record must be evaluated in its entirety); Social Security Ruling (SSR) 96-2p. With regard to Dr. Lynch in particularly, the out of hand rejection of her assessments of Plaintiff's impairments is troubling. The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. *Thomas v. Sullivan*, 928 F.2d 255, 259 n. 3 (8th Cir. 1991); *see* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

Finally, Plaintiff points out in her brief that since December 5, 2000, five (5) treating or examining psychologists or treating psychiatrists have reported her as having a Global Assessment Functioning ("GAF") Scale Score of 50.[6] That the ALJ ignored these lower GAF scores and the only mention of a GAF score in his opinion is that the claimant had a GAF rating

---

[6] "GAF" is a standard measurements of an individual's overall functioning level with respect only to psychological, social, and occupational capacities. Ratings are made on a scale of zero to 100 and reflect a clinician's subjective view of an individual's overall psychological functioning. The range between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, **unable to keep a job**)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000)(emphasis added).
 Pursuant to the final rules of the Social Security Administration, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." 65 Fed.Reg. 50746-01, 50764-65. However, the rules still note that the GAF remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." *Id.* Other courts have held that GAF scores constitute medical evidence accepted and relied upon by a medical source and must therefore be addressed by an ALJ in making a determination regarding a claimant's disability. Such courts have explicitly held that an ALJ's failure to explain how he weighted and discounted the significance of a claimant's GAF score requires a remand for the ALJ to clarify the basis of his holding. *See, e.g., Dougherty v. Barnhart,* No. 05-5383, 2006 WL 2433792 (E.D.Pa. Aug. 21, 2006); *see also Duncan v. Barnhart,* 368 F.3d 820 (8th Cir. 2004)(granting benefits to a claimant with GAF scores between 50-65 based on the finding that claimant lacked the emotional or mental capacity to work day in and day out).

of 80 in September 2001 at an intake evaluation prior to admission into the methadone program. The intake evaluation obviously was for the purpose of assessing the claimant's suitability for the methadone program and was not a full examination. The assessment noted only her opiate disorder, did not reflect any of her well-documented psychiatric disorders, and expressly noted that the Axis II diagnosis was deferred. (R. 180). Thus, the GAF score relied upon by the ALJ was not even based on a complete assessment. The ALJ's decision to rely on this score only and his failure to even refer to the other, more comprehensive assessments rendered by the claimant's treating physicians further underscores that the ALJ's approach in this case was to pick and choose only those particular entries in the medical record which supported his ruling.

The Court recognizes that the case law supports an ALJ's ability to make a factual finding that a claimant is able to work when she is not abusing substances as long as there is evidence demonstrating the claimant's ability to work during periods of sobriety. *See, e.g., Vester v. Barnhart*, 416 F.3d 886 (8th Cir. 2005)(The ALJ's finding the claimant functioned normally when sober supported determination that alcohol use was a contributing factor material to claimant's disability). This, however, is not a case in which when the claimant was not using drugs, she was able to work. The record evidence does not indicate that Plaintiff functioned normally when she was not abusing pills. Accordingly, the Court questions the ALJ's qualifications to reject the opinion of Dr. Lynch, Plaintiff's long-time treating psychiatrist, and to conclude on his own, without further medical evidence, that Ms. Mory is not disabled in the absence of substance abuse. Legal principles prevent an ALJ from improperly substituting his opinion for that of a medical expert or from "playing doctor." *Ness v. Sullivan*, 904 F.2d 432, 345 (8th Cir. 1990); *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.1996) (collecting cases).

The ALJ's conclusions essentially ignore the views of Plaintiff's treating psychiatrists and do not adequately consider the period between September 17, 2001 and June or July of 2004, when substantial evidence of drug abuse is lacking.[7] The Court concludes that the ALJ improperly substituted his opinion for that of Plaintiff's treating physician. The Court further concludes that at best, the record medical evidence simply does not show what limitations would remain in the absence of any substance abuse.

The Court specifically notes that the ALJ also failed to consider the likelihood that Plaintiff has permanent impairments caused by *past* drug abuse, such as cognitive loss, which will not go away even in the absence of drug use. This is particularly important in this case given Dr. Lynch's observations that Plaintiff's retention and recall skills were impaired to the degree that it made task performance difficult. (R. 141). *See Pettit v. Apfel,* 218 F.3d 901, 903 (8th Cir.2000) ("The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause."). The Court questions how such determination could be made without additional input from Plaintiff's physicians or a consulting physician. Further, in assessing Plaintiff's remaining residual functional capacity on remand, the Commissioner is directed to consider Plaintiff's "ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc).

### C. CREDIBILITY

In light of the Court's findings, it is unnecessary to undertake a complete assessment of

---

[7] *See* discussion, *infra*.

the manner in which the ALJ evaluated Ms. Mory's credibility. However, the Court feels compelled to make two comments.

The records consistently indicate that Plaintiff has financial issues that may limit her access to treatment. For example, Dr. Lynch noted during a June 26, 2002 visit that Plaintiff was not able to get back on Luvox[8] because of financial issues related to the cost of the medication. [R. 312]. Elsewhere throughout the treatment records, Plaintiff's financial stress is consistently and repeatedly noted in the Axis IV Assessment.[9] For example, Dr. Lynch consistently and repeatedly reports on her Axis IV assessments that Ms. Mory is experiencing problems related to economics and access to health care. Accordingly, the ALJ's conclusion that Plaintiff's financial limitations have not impaired her ability to access medication or treatment is contrary to the record. (R. 24).

The ALJ discredited Plaintiff's subjective complaints and alleged functional limitations by noting that she passed her GED in 2000, enrolled in a cosmetology program in early 2000, and "managed and ran a business cleaning houses." (R. 24). The earliest Plaintiff alleged an onset of disability was September of 2001. At that time it had been approximately eight years since Plaintiff had managed her own cleaning service. Additionally, Plaintiff is not alleging that she was disabled in 2000, when she passed her GED and enrolled in a cosmetology program. Additionally, Plaintiff was unable to complete the cosmetology program and the record indicates

---

[8] Luvox is an SSRI used to treat depression and obsessive-compulsive disorder.

[9] Because mental disorders are often characterized by impairments in several areas, diagnosis requires a multiaxial evaluation. This assessment is commonly made by reference to Axis I, II, III, IV, and V assessments. Axis IV assessments refer to psychosocial and environmental problems. *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed.1994), pp. 25-32.

that such failure was due to interpersonal conflicts (which supports Dr. Lynch's subsequent assessment of her inability to relate predictably or behave in an emotionally appropriate manner). Thus, the Court finds it difficult to see how such "inconsistencies undermine[d] the credibility of the claimant's testimony." (R. 24).

## CONCLUSION

Based on the preceding and the record as a whole, this Court finds that the ALJ's decision is not supported by substantial evidence.

IT IS THEREFORE ORDERED THAT the Commissioner's decision be, and it is hereby, REMANDED for further administrative proceedings and for reconsideration of Plaintiff Sheila Mory's claims in a manner consistent with this opinion. On remand, the ALJ may reopen the present record and may accept any additional evidence deemed appropriate.

IT IS SO ORDERED THIS  28t h day of March, 2007.

                                       /s/Garnett Thomas Eisele  
                                       UNITED STATES DISTRICT JUDGE